Do you want to take a break, or are you okay? I'm fine. Do you want to take a break? I'm good. Don't be shy. Come on up. Our next case is number 21-10923, Stacey Scott v. Donald Perry, et al. Okay, Mr. Green, whenever you're ready. Good morning, Your Honors. May it please the Court, my name is Rashad Green, and I represent the appellant Stacey Antonio Scott, Jr. in this case. There are three reasons why the trial court's order dismissing Mr. Scott's complaint with prejudice should be reversed. The first is the trial court acted without jurisdiction to enforce the settlement agreement between Mr. Scott and appellees Perry and Braswell. The second issue is there's genuine issues of material fact that exist as to whether or not appellee Lorenz acted deliberately indifferent to Mr. Scott's medical needs. And the third reason is there are genuine issues of material fact as to whether or not Mr. Scott adequately met the pre-suit requirements for a medical negligence claim under Florida law. I'd like to start with the jurisdictional argument with respect to the settlement agreement. In the United States Supreme Court decision in Conklin made clear that a settlement agreement is a private contract that is outside of the ancillary jurisdiction of a federal court. Yes, but that's once a case is closed, right? So a federal court doesn't have inherent jurisdiction to enforce a settlement agreement once it loses jurisdiction over the case, unless it keeps jurisdiction or there's a stipulation allowing the court to enforce the terms of the agreement. But here the case was not closed, right? That's correct, Judge. But there was also no stipulation and no agreement. And this court's decision in Inago discusses the procedures by which a court, the federal court, can retain jurisdiction over a settlement contract. That's after it's closed. That's after the judgment centered. That's correct. Well, after the – I'm sorry. Think of this scenario. You go to the pretrial conference a week before trial, and I'm not saying you. The parties show up, and there are two defendants, one plaintiff. And one defendant and the plaintiff say, we've settled our dispute. The defendant's going to pay $25,000, and in exchange I'm going to provide a complete release of liability. And the district court asks both sides and not only the litigants but the lawyers and is satisfied. And the district court says, and when are you tendering the money? And they go, Judge, today's Tuesday. We're going to tender by Thursday because otherwise we'd be in trial before you on Monday. Defendant doesn't tender the check, right? And then you show up in trial on Monday, and you're like, Judge, I want you to enforce the settlement agreement that we announced in front of you in open court and force that defendant to pay me the $25,000 that he or she or it promised. You're saying that the district court has no jurisdiction to take any action on that request? Under those facts, the district court may have jurisdiction because if I'm understanding your hypothetical correctly, there would have been consent from the parties in open court and also under. Consent doesn't affect jurisdiction. But the terms of the agreement would have been on the record in that case. But that's not a jurisdictional point. Well, that's a point about the merits of whether or not you could or should enforce the agreement. But it doesn't go to the court's jurisdiction. I'm having trouble figuring out why you think the district court didn't have jurisdiction to enforce a settlement agreement while the case was still ongoing. Because the Supreme Court said that private or settlement agreements that are made in a federal court case are private contracts that are to be enforced in state courts. And so here, what is alleged to have happened is he enters into a private contract as an unrepresented litigant. And then from there. And spends the money. Well, he disputes that he spent all of the money because some of the money that was deposited into his trust account was automatically drafted. And so that was money that was already spent. And it's also unclear from the record if he had knowledge that they were depositing when exactly they deposited the money into his account. Because he was in between facilities when they deposited the money. But because this contract was a private contract under the Supreme Court's decision in Conklin, the court held that there's no basis for federal court jurisdiction over a breach of contract that produced the dismissal of an earlier federal suit. And in the actual agreement, the parties even say that if we do have a breach of this contract, the appropriate remedy is to seek enforcement in state court. And it had a forum selection clause that mandated that the agreement must be placed or must be litigated in Leon County State Court. Let's move on to Dr. Urenz. So one of your claims with regards to Dr. Urenz is that he didn't provide sufficient pain medication to your client, right? That's correct. And that he improperly prescribed ibuprofen and then naproxen when those things didn't work and or made your client nauseous, right? Yes. Okay, but you also have the independent orthopedist. That's correct. Dr. Esquiva, who also decides to prescribe him the same sort of medicine over your client's objections. So if you have two doctors, one of whom is outside of the prison system, giving him a type of prescription for his pain, why is that not just at most negligence as opposed to deliberate indifference? Because what deliberate indifference looks at is whether or not there was any intent or any knowledge of the doctor, in this case it would be Lorenz, had any knowledge of his pain. And whether or not what he was given, in this case it was ibuprofen, adequately quelled his pain is a question of fact. Not always. It may be a matter of negligence on the part of a doctor, but deliberate indifference is a much higher standard. And just because you disagree with a doctor on a certain mode of treatment doesn't necessarily mean you have deliberate indifference. Right. And I think that a jury would be able to look to the statements that my client alleges that he made in his declaration to determine what type of intent the doctor had when he prescribed medication that my client said did not work for him, also caused him nausea, headaches. And that a jury could infer that if a patient is telling you a particular type of pain medication is not working and coupled with the type of injury, which was in this case it was a fracture, that perhaps he was deliberately indifferent in providing him medication that would... Was there any evidence in the record as to what you think Dr. Lorenz should have prescribed? There is no evidence in the record as to what I think that he should have prescribed, but... Doesn't that cause some problem for you? No, I would argue that it does not cause any problems for us. What he would need to show is that he told him essentially that this, whatever medication it was, and it was ibuprofen in this case, is not working. And according to his declaration, he says that he told him that he didn't have to, excuse my language, take the shit and that he was the one that was in pain, not him. And so that shows a conscious disregard for the fact that this person is in pain. But yet another doctor outside of the prison system prescribed him essentially the same medications even though your client made the same complaints. Right. Doesn't that indicate that two different doctors came to the same conclusion about what was feasible and what was appropriate? I think that's what Dr. Lorenz would be able to argue at trial is that, look, one doctor out here said it was okay. This doctor, you say that it wasn't okay, you know, when it came from Dr. Lorenz. And those two, a jury would be able to assess whether or not, based on what Mr. Scott had said, and basically here with respect to the pain, it would be the treatment that he received. The standard with respect to the deliberate indifference on a summary judgment proceeding required that the inmate would have to get some medical opinion to contradict the two other doctors. I'm sorry, I'm not sure I understand your question. Can you repeat? But doesn't the deliberate indifference standard that you have to use in these prisoner civil rights cases require that if two doctors have made a statement with respect to proper medical treatment, the inmate can't on his own dispute that by his own statement. He's got to get some medical evidence that the trier of fact can then say, well, there is a disputed issue of fact. The prisoner is not a doctor. Right, right. And I think that's what you're drawing on the line of deliberate indifference and negligence. Right. And didn't he mess up by not getting medical opinion that this noxiprofen or whatever the drug was, is the wrong thing to prescribe when this is the situation? No, Your Honor. No, I don't believe that there is a requirement of that nature. I think all you really need to show to draw the line between negligence and deliberate indifference is primarily how evidence of the intent behind the prescribed medication. And here, Mr. Scott at length discusses how he was treated by the doctors when he told them that this medication would not, you know, quell his pain. And he would be able to argue to a jury, presumably, that they should have taken his recommendations as to his pain because he's the only one that understands the extent of his pain. And so if there is another way to treat his pain that wasn't explored, the evidence from the state of mind of these doctors would go towards whether or not there was a deliberate indifference in denying him some other form of treatment. All right. Thank you very much, Mr. Green. You've saved your time for rebuttal. Yes. Mr. Toomey. Yes. It's nice to see each one of you again. Greg Toomey, I represent Dr. Lorenz and Nurse Phillips. The district court got it right. So let me ask you one question. Did Dr. Lorenz provide any sort of a declaration or affidavit as to his course of treatment? He did not. So we have an absence of evidence from both sides as to the reasons why certain pain medications were provided. Well, I think it's relatively self-evident. The naproxen, excedrin, and ibuprofen were provided not just because they're NSAIDs, but because of the condition of the patient. And that is incarcerated. Narcotic pain medications are generally never used in prisons or in jails because, first of all, a lot of people that are there have an addiction problem. Second, their currency. Other people there want them. People get hurt when they're trying to steal them. So the use of these pain medications is hardly unusual. I would expect it if I broke my finger. I'm not getting narcotic pain medications. If I broke my ankle, I'm not getting them. I'm pretty sure. No, but I mean, as someone who is not trained in medicine, I would think that there are non- or at least I would guess that there are non-narcotic alternatives to the things that were prescribed here and that the doctor had a range of choice as to which ones to give on the non-narcotic side, right? So, for example, think of, in a layman's term, think of Tylenol and Advil, right? For some people, Tylenol works. For other people, it works less well. Same thing goes for Advil. And so you could prescribe one but not the other. One might work. The other one might not work. But a doctor wouldn't keep giving one of the two if it didn't work for a certain patient, right? They'd switch off to another one to see if that one provided any relief. Well, actually, at the same time, he was provided two. I beg your pardon? is within medical judgment that the court isn't going to disturb. That if a doctor thinks that's the right med, then unless it's way out irrational, then the court is going to follow it. That's just one of the medical judgments that a physician has to make. And that's within prisons or outside. That's the judgment to be made by the professional. And Dr. Esquiva prescribed essentially the same thing, right? A week later, he had an x-ray. Everything was aligned. He was ready for healing. He then additionally sent him off to the specialist, which he didn't really have to do. It was healing on its own. But he sent him off to the specialist anyway. So the treatment was provided, I don't think, is the question. The other problem with the case for the plaintiff was that there's, and you brought it up, Judge Schlesinger brought it up, there's no medical evidence, verified medical evidence, that the fracture became worse because of delay in getting him to the ortho that didn't do much. The ortho didn't do anything. So it's just another problem with that portion of the case. If I can, I'll go on to Nurse Phillips. Sure. All right. State law requires, and there's no question in the case, that an expert affidavit accompany a pre-suit notice. The claim is that it was not necessary for him to get a pre-suit expert because the records weren't provided. The records were requested of Nurse Phillips' former employer. By the time the first request came in, Corizon no longer had this contract. So the first request was sent to the subsequent contract medical provider. I think in that statute, it presupposes that the person or entity you're sending the request for records to has the ability to provide them. And it's always going to be an entity or in the instance where it's a sole practitioner, physician, the request could be sent there and it wouldn't necessarily be the entity. It could run to another person. That's not the case here. The request never met a defendant, and that's necessary. You're not going to exclude the necessity of providing an expert affidavit prior to suit and use it against somebody that's not a defendant. And the people that he sent the request to have never been defendants. So I don't understand the argument, mostly. There's also some indication in the record that at some point somebody offered at least some of the records, but he didn't pay for them or didn't offer to pay for them? Well, that's what it is. He made these requests, inmate medical request form requests, wanting his records, and he got a response back saying, okay, it's 15 cents a page. That response was from the Florida Department of Corrections, certainly not Nurse Phillips. And right, he didn't want to pay for them. He has to pay for them just like anybody else. And at 15 cents a page, like the court found, it's not an excessive cost even for an inmate. Okay. All right, Mr. Mead. Thank you very much. Ms. Baker? Good morning. May it please the court. My name is Samantha Josephine Baker with the Florida Attorney General's Office, and I represent the Appalese Sergeant Donald Perry and Officer Jeremiah Braswell in this matter. The court should affirm the district court's dismissal with prejudice based on the parties' settlement agreement. The district court had jurisdiction, as this court's pointed out. The action was still pending prior to dismissal when the parties had executed the settlement agreement, and the district court was correct in granting the defendant's motion to enforce for three reasons. First, that the court had authority to enforce the settlement agreement when Mr. Scott refused to abide by the agreement, again, prior to the dismissal. The second, that Florida law governs the enforcement of settlement agreements, and that was at issue here in this litigation. And third, that Mr. Scott had ratified the agreement by accepting the monetary benefits, as Judge Schlesinger pointed out, that he did spend the funds. Just briefly to address a few of the points that Mr. Scott's counsel raised, this is not a case for ancillary jurisdiction because the case, again, was still pending and not yet closed. That's distinguishable from the Supreme Court case cited and consistent with the Kent case before this court. To address the court's question regarding expenditure of the funds, the district court considered the motion to enforce that was filed with Exhibits A through D. The settlement agreement was attached in Exhibit A. The ledger of the inmate trust account statement in Exhibit B that shows that the deposit was made to his inmate trust account on March 2nd. And later, once his liens were paid, which were referenced and contemplated in the settlement agreement, dispersed to Mr. Scott for full use on March 11th, which he promptly began spending, as evidenced in the exhibit attached to the motion to enforce. The district court properly considered the motion to enforce, the record evidence supplied with it, and properly ratified or dismissed the case by acknowledging the agreement and the settlement and Mr. Scott's benefits that he received from it. He moved to vacate the settlement agreement at the same time you or the state moved to enforce the settlement agreement, right? There was about two weeks in between. So the notice of pending settlement was filed on January 30th and approximately five weeks had elapsed before Mr. Scott moved to vacate the settlement. I would submit that he was able to put the settlement at issue before the court. District judge had ruled that the motion was premature, that the settlement agreement was not yet before the court due to the fact that either the stipulation of dismissal with prejudice was not filed or that the defendants had not yet moved to enforce. So you're correct, the trial counsel did move to enforce on April 12th. Mr. Scott's motion was filed on March 13th. Again, the initial settlement or notice of pending settlement was filed on January 30th. If the court has no other questions, I would rest on the on the brief and ask that the court affirm the district court's dismissal with prejudice of the third amended complaint as to Perry and Braswell. Thank you, Your Honor. Thank you very much. Just briefly, Your Honor, I would like to address the argument that the three and a half week delay in treatment did not further fracture my client's foot. That statement is correct, but I think what the court should focus on is essentially whether or not the three and a half week delay caused any further harm. And the further harm here would be that the three and a half week delay you're talking about is the period between what and what? The period between when Dr. Lorenz issued the referral as routine rather than urgent and which my client claimed in his declaration caused the three week delay based on what Dr. Esquivia told him. And in that three week delay, the fractured bone ended up healing in a displaced manner. And they, according to the declaration that was filed in support, the doctor told him that they would not be rebreaking it because of his youth, essentially. But nonetheless, it had formed in a displaced manner and it is deformed to this day. But weren't there X-rays during that period of time and shortly afterwards that show that it was healing in an aligned way? I believe it does say aligned, but it also says it's displaced. In other words, it was never reset is my understanding and interpretation of the medical records that you're referring to. Okay. All right, Mr. Green. Thank you very much. Thank you. Mr. Toomey, Ms. Baker, thank you very much as well.